STATE OF MISSOURI, RESPONDENT, v. E. E. MOON AND W. A. PARKER, DEFENDANTS, W. A. PARKER, APPELLANT.*

Kansas City Court of Appeals. May 3, 1926.

*Corpus Juris-Cyc References: Criminal Law, 16CJ, p. 890, n. 46; p. 964, n. 34; p. 1104, n. 91; 17CJ, p. 356, n. 13; Indictments and Informations, 31CJ, p. 854, n. 38; p. 857, n. 72, 76; Intoxicating Liquors, 33CJ, p. 751, n. 11; p. 758, n. 80; p. 782, n. 52; p. 795, n. 19.

*DuVal Smith,* Prosecuting Attorney, and *C. W. Meyer* for respondent.

*Bart M. Lockwood* for appellant.

BLAND, J.—Defendant Parker together with one Moon were jointly tried and convicted of having a still fit for use in the distilling of intoxicating liquor, contrary to section 2 of the Act of April 3, 1923, concerning intoxicating liquors. [See Laws of 1923, p. 237.] The punishment assessed by the verdict of the jury was a fine of $100 and thirty days in the county jail. Defendant Parker has appealed.

The facts show that on March 10, 1924, some officers of Buchanan county, armed with a search warrant, raided a place just south of the city limits of St. Joseph. When they arrived at said place they found the defendants working on a Ford delivery truck in a part of a structure that had been previously used as a slaughter house. This

was an L shaped building, the longer part running east and west. The east end of the building was a room which ran into a cave under a hill and was used as a cooler. This cooler room was closed and was locked with a padlock. At the west end of this building and under the same roof was a projecting L to the south which was partitioned off from the rest of the building. The south front of this L had been torn out and at the time of the raid it was being used as a garage and work place for repairing automobiles. The premises consisted of about eight acres. There was a house on the premises, built on a hill-side about seventy-five or eighty feet from the slaughter house and near and east of a public road. The first floor of this house consisted of one room with a concrete floor; the second floor was arranged for living quarters. On the west side of the house there was a door leading to the first floor. There was a stairway leading from the lower to the upper floor, which floor was entered through a trap door similar to an old fashioned cellar door. On the east side, next to the hill, was a short stairway on the outside, leading to the second floor; at the bottom of this stairway was a kennel in which was chained a vicious bull dog.

Moon testified that the officers approached and asked who was the proprietor to whom they could read a search warrant. Moon did not say anything to them but Parker said, "I guess I will do, go ahead and read it." The search warrant was then read. The State's evidence tended to show that after the warrant was read, defendants were placed under arrest. Defendants were asked for a key to the padlock but said that they had none, whereupon the officers procured a pick and started to break the lock. The State's evidence shows that while the officers' attention was thus momentarily directed upon this work, the defendants ran into the house. Two of the officers ran after them; one of these officers testified that, "I . . . ran up to the door and started to go up the back stairs where this dog was and I backed off. I backed off and something was thrown out this back door, throwing off an awful odor of liquor." One officer had gone into the lower floor and found the door leading from the lower to the upper floor closed. The officers called to the defendants to come down. Finally Parker opened this door and come down stairs, having in his hand a large butcher knife which he had been using in his work on the car. Afterwards Moon came down. After the officers finished searching the room that had been locked, they went to the residence and found upstairs a five-gallon jug, a one-gallon jug, several bottles that had had liquor in them, "Well, there was a little bit of liquor in each one of them yet, they never had been rinsed out."

After the padlock was broken, the officers entered the cooler room and found no one in it. However, they found two stills, not far apart, with the usual equipment, each on a lighted gasoline stove, in full

operation. They also found five barrels containing a mixture of corn and rye mash. Before the cooler room was entered, there was an odor from the stills that could be plainly detected at the place where the defendants were working on the car, which was only fifteen feet from the stills. After the stills were discovered, the officers found a sack containing a five-gallon jug of corn whisky in the dog kennel, one officer reached in and seized the liquor while the dog was being held.

The latter part of February, 1924 (the exact date not being shown), the prosecuting attorney and an assistant with some police officers went to the house in question a little before midnight. At that time they found therein Moon and his wife and children. Moon was upstairs in bed, with a sore leg, claiming that shortly before he had gone to quiet the dog and had fallen down the stairway; Moon stated that the dog was his and that he was the head of the house and that he was in charge of the premises. There was a dance going on downstairs in which several people were taking part, and a piano player was in operation. Soon defendant Parker came in. Parker first told one of the officers that he owned the place and that he had rented it or sub-let it to defendant Moon. Afterwards Parker said that the property belonged to one Mannschreck. To the prosecuting attorney Parker said he had leased the place from a Mr. Mannschreck. The evidence further shows that on March 20, 1924, Parker pleaded guilty to the crime of receiving stolen goods and was fined $25; he also pleaded guilty at another time to receiving stolen property belonging to the Burlington railroad.

The evidence of the defendants tended to show that Parker and one Kerns were running a retail store in the City of St. Joseph and had used the outhouse in question as a slaughter house; that they had leased the premises from one Mannschreck but in July prior to the arrest of the defendant they rented to Moon an acre of ground and the house. About February 1, 1924, Parker and Kerns quit using the outbuildings and rented them to Moon who thereafter tore out the end of the building and started a repair shop there. Moon testified that he thereafter rented the cooling room to a stranger by the name of ''Charley'' but whose last name he did not learn, for a place for Charley's tools and that Charley put the padlock on the door and was the only person the witnesses knew who had access to the room. On the morning of the arrest Parker telephoned Moon about having him fix the brake bands on the former's Ford delivery truck. Parker had been on the place about twenty or thirty minutes before the officers arrived, he was doing no work on the car but was waiting until Moon finished with it. Both of the defendants denied any knowledge

of the existence of the stills or liquor upon the premises. Parker testified that after renting the premises to Moon, he did not go there except to collect the rent but that about 11:30 of the night that the officers were first there someone called him over the phone and said that "they was raiding the house down there, and they was going to throw Moon out, and that Moon had got hurt, and that they would like for me to come down right away." So he went to the place and found the officers there.

The information upon which defendants were tried, charged that the defendants ". . . on or about the 10th day of March, 1924, . . . did then and there feloniously and unlawfully use a still, worm, doubler and mash tubs in the process of distilling, making and manufacturing intoxicating liquor for sale and transportation for sale," etc.

It is insisted that the court erred in giving the State's instruction No. 4 telling the jury to the effect that they could convict defendants either of using a still or having a still in their possession. The defendant Parker claims that he could not have been convicted of having a still upon an allegation of use of a still as charged in the information. The statute under which defendants were prosecuted reads as follows:

"If any person *shall use* in this State any still, worm, doubler or other distilling, or brewing equipment or utensils whatsoever, in the process of distilling, brewing, or otherwise manufacturing any intoxicating liquor for sale or transportation for sale contrary to the provisions of this act, he shall be deemed guilty of a *felony,* and, upon conviction thereof, punished by imprisonment in the State penitentiary for a term of two years, and if any person *shall have* any such still, worm, doubler, or other equipment, or utensil whatsoever, fit for use in the distilling, brewing or manufacturing, of any intoxicating liquors, now in violation of this act, or any other law of this State, and shall not have used the same in brewing, or the manufacture of any such intoxicating liquor, he shall be deemed guilty of a *misdemeanor* and, upon conviction thereof, punished by a fine of not less than one hundred dollars, nor more than one thousand dollars, and by imprisonment in the county jail for a term of not less than thirty days nor more than one year." (Italics ours.) [Laws of 1923, p. 237.]

"It was a rule at common law, and is now the general practice, that when an indictment charges an offense which includes within it another less offense, or one of a lower degree, the defendant, though acquitted of the higher offense, may be convicted of the less. The statement of the rule indicates that it always implies that the lesser offense is included in the higher crime with which the accused is

specifically charged, and the averment of the indictment describing the manner in which the greater offense was committed must contain allegations essential to constitute a charge of the lesser. . . . A person cannot, however, be convicted of an entirely different offense from that contained in the indictment. To test the question whether an indictment for one offense includes another, it has been said that where the offenses are of the same general character, the indictment for the one offense must contain all the essential elements of the other, otherwise the prosecution for the latter cannot be maintained.'' [14 R. C. L., pp. 210, 211.] [See, also, 31 C. J., p. 854; State v. Hamill, 127 Mo. App. 661; State v. Quinn, 94 Mo. App. 59.]

It is difficult to imagine a case where one could use a still for the purpose of manufacturing liquor and not at the same time ''have'' the still. We think that the Legislature in grouping the two offenses in one section in the manner in which it has been done, undoubtedly, intended to provide for two offenses, the second of a lower degree than the first and that the first offense should include the second, and we think as a matter of fact that the second is an offense of a lower degree which is included in the first. [State v. Spillman, 110 Wash. 662; State v. Montgomery (Wash), 209 Pac. 1099; State v. Nunn (Wash.), 210 Pac. 771; Todd v. State (Texas), 229 S. W. 515, 516.]

The instruction contains the words ''as charged in the first count of the information,'' but this does not subject it to the criticism that it refers the jury to the information for the issues, for the reason that all the facts necessary to convict, are set forth in the instruction and the matter quoted may be regarded as merely surplusage.

It is insisted that in view of the wording of the State's instructions, the verdict is void in that the punishment was not assessed separately as to each defendant as provided in section 4046, Revised Statutes 1919. [State v. Hicks, 170 Mo. App. 183.] Undoubtedly this was an irregularity, but as defendants were given the minimum punishment we will not remand the cause. [See State v. Hicks, supra, l. c. 186.]

It is insisted that there was evidence of two stills and the verdict should have specified which still the accused possessed. Defendants in support of this contention urge that the jury ''did not find both stills in the possession of both defendants, perhaps some jurors thought one still belonged to one and the other to another, they may never have agreed on that point,'' citing, among others, the case of State v. Washington, 242 Mo. 401. In that case the defendant was charged with setting up and keeping certain gaming tables, etc. There was evidence of a room in which there were two pool tables, which were used as crap tables. There was a man in charge of each game and collected from the players the ''take-off'' for the house. There was testimony, though of different witnesses, tending to prove the setting up and keeping of each gambling device as charged. The ver-

dict merely found the "defendant guilty as charged," and the court said, at l. c. 409, 410—

"In directing the jury that they should return a verdict of guilty if they found that the defendant set up and kept both or either of the gaming devices charged, the court erred. The defendant was entitled to a unanimous verdict of the jury upon the issue of his guilt or innocence of the particular offense for which he was on trial. Under this instruction and the general verdict returned, some of the jurors may have believed the testimony in support of the charge as to one of the gaming devices and disbelieved the testimony as to the other, while the remaining members of the jury may have found and believed conversely.

"It is well-established law that the verdict must be definite and certain as to the crime of which the accused is found guilty. If the instruction had submitted the case upon the theory of guilt as to both gambling devices (no motion to quash or elect having been filed), or as to one of such devices, specifically designating it, the conviction could have been sustained. But in the form in which the instruction was given it cannot be determined from the record whether the defendant was convicted of setting up and keeping both tables described or of only one, and if the latter, then which one."

State v. Jackson, 242 Mo. 410; State v. Geist, 196 Mo. App. 393, and State v. Frazier, 269 S. W. 410, are to the same effect. The facts in the case at bar are entirely different from those in the cases upon which the defendants rely, except the Frazier case and we cannot tell as to that one for the specific facts disclosed in the opinion in that case are meager. Here there was no evidence from which the jury could possibly find that the defendants, or any one of them, were guilty of having one still without finding them guilty of having the other. The evidence was that the two stills were upon two stoves, in close proximity and in the same room which was locked. Neither one of the defendants was seen in this room. They both denied having any knowledge of the stills. Under the evidence they were either guilty of having both stills or not guilty at all.

It is insisted that the prosecuting attorney and his assistant in arguing the case to the jury "continued to testify and argue matters not brought out on the witness stand." On examination of the record, we find that the prosecuting attorney and his assistant in arguing the case merely referred to what was in evidence and that they did not go without the record as claimed.

It is insisted that the court erred in permitting the prosecuting attorney in his opening statement to state to the jury that he and some other officers, sometime before the finding of the stills on the premises, were to the house in question and that both defendants were there, and at that time defendant Parker admitted "that he was the leaseholder and had a lease on that place;" that this transaction

was too remote and had no bearing upon the case. We think to the contrary. It tended to show the interest or proprietorship that Parker had in the premises. [33 C. J., pp. 781, 782, sec. 536.] Over the objection of defendants the court permitted the State to show that the officers went to the house on the night in question, that they saw the defendants there and permitted these witnesses to describe what defendants were doing and the general situation there, including the presence of people and what they were doing. These witnesses did not testify that there was any crime committed at that time. From what we have said the court did not abuse its discretion in admitting this testimony for the reason we have given.

It is insisted that the evidence was not sufficient to convict the defendant Parker of having a still in his possession. We think there is no merit in this contention. This defendant testified that when he was called up and told that the house was being raided and that "they was going to throw Moon out and that Moon had got hurt and that they would like for me to come down right away," that he came in response to the call. The evidence shows that when he arrived he made contradictory statements as to his relationship to the place and that his first statement made to one of the officers in this regard was inconsistent with the relationship he bore to the place as described by him at the trial. The State's evidence shows that on March 10, 1924, when the officers arrived both Parker and Moon were working on the car within fifteen feet of the stills and where they could detect a strong odor coming from them. When they were asked upon whom the warrant could be served, Parker said, "I guess I will do." The warrant was read to him and the defendants were put under arrest and when the officers' backs were turned, defendants ran into the house, and from the evidence there is a strong inference that the purpose of this was to dispose of some liquor. The testimony in reference to this shows that liquor was thrown out of the house and when the officers went inside they found some jugs and bottles that had been emptied of their contents except for a small amount of liquor that had been left therein, which had not been rinsed out. All of this testimony taken together amounted to more than a mere suspicion that defendant Parker was connected with the illegal transactions that were going on upon the premises, and constituted some evidence from which the jury could say that he was guilty of the offense of which he was convicted. [State v. Heimbaugh, 249 S. W. 445; State v. Biddlecome, 250 S. W. 917.]

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.